# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **KELSE NEAL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:25-cv-00027** |
| | ) | **Judge Aleta A. Trauger** |
| **VI-JON LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Before the court is the Motion for Summary Judgment (Doc. No. 32) filed by defendant Vi-Jon LLC ("Vi-Jon"), seeking summary judgment on plaintiff Kelse Neal's pregnancy discrimination and failure-to-accommodate claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, as amended by the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k); the federal Pregnant Workers Fairness Act ("PWFA"), 42 U.S.C. § 2000gg *et seq.*; and the Tennessee Pregnant Workers Fairness Act ("TPWFA"), Tenn. Code Ann. § 50-10-101 *et seq.* Neal opposes the motion.

For the reasons set forth herein, the motion will be denied.

## I. LEGAL STANDARDS – RULE 56

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

By its very terms, Rule 56 anticipates "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment.

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). The "mere existence of a scintilla of evidence in support of the" nonmoving party's position is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.* If so, summary judgment is not warranted.

## II.      PROCEDURAL HISTORY

Kelse Neal initiated this action in January 2025, after exhausting her claims before the EEOC and being issued a Notice of Right to Sue. (*See* Doc. No. 1-1.) She filed an amended and corrected First Amended Complaint ("FAC") in May 2025. (Doc. No. 23.) Count I of the FAC sets

forth a claim for "Sex/Pregnancy Discrimination, Denial of Reasonable Accommodation, and Termination in Violation of Title VII and the [PDA]."[1] (FAC at 5.) Under this count, Neal asserts that Vi-John discriminated against her by denying her reasonable accommodations, requiring her to take unpaid leave, and then terminating her. (*Id.* ¶ 30.)

Count II asserts a "Violation of the [PWFA] by Failing to Reasonably Accommodate Plaintiff and Taking Adverse Employment Actions Against Plaintiff." (*Id.* at 6.) This count asserts that Vi-Jon "refused to accommodate Plaintiff's 20 pound lifting restriction and her need for frequent seated breaks and instead required her to take unpaid leave and terminated her employment." (*Id.* ¶ 36.) It also asserts that the defendant "failed to engage in the interactive process." (*Id.* ¶ 38.)

Count III states a claim under the TPWFA. (*Id.* at 7.) In support of this claim, the FAC asserts only that the plaintiff "required a reasonable accommodation as a result of her pregnancy" and that Vi-Jon terminated her because she "utilized a reasonable accommodation" related to her pregnancy. (*Id.* ¶ 44–45.)

Vi-Jon filed an Answer, admitting some of the factual allegations in the FAC but denying liability. (Doc. No. 24, Ans. to FAC.)

Following a period of discovery, the court denied the plaintiff's request for leave to file a motion for partial summary judgment, and defendant Vi-Jon has now filed its Motion for Summary Judgment as to all claims in the FAC, accompanied by supporting Memorandum of Law (Doc. No. 33), Statement of Undisputed Material Facts ("SUMF") (Doc. No. 34), and the evidentiary material cited in its SUMF. The plaintiff filed a Response in Opposition (Doc. No. 39), Response

---

[1] The defendant interprets the FAC as setting forth separate discrimination claims under Title VII and the PDA, while also noting that the PDA is an amendment to, and incorporated as part of, Title VII. *See* 42 U.S.C. § 2000e(k)

to the SUMF ("RSUMF") (Doc. No. 38), and a substantial quantity of evidentiary material in support of her opposition. The defendant filed a Reply (Doc. No. 40), accompanied by excerpts of deposition transcripts already in the record.

## III.    FACTS

Defendant Vi-Jon is engaged in the manufacture of personal care, health, and hygiene products for retail, institutional, and healthcare customers. (RSUMF ¶ 1.) The plaintiff was employed by Vi-Jon on February 21, 2024 to work as a full-time third shift Utility Operator in Vi-Jon's Smyrna, Tennessee facility. (*Id.* ¶¶ 9–10.) At the time she was hired, the plaintiff was approximately two months pregnant, though she did not disclose that fact to Vi-Jon. (*Id.* ¶ 10.)

According to the plaintiff, the most physically demanding part of her job consisted of putting three eight-pound bags[2] of different kinds of salt into boxes and then sliding the box down the motorized conveyer to the next worker on the line. (Doc. No. 38-2, Neal Dep. 38.)[3] Otherwise, she had to "keep the line clean" and "check for broken bags." (*Id.*) She worked other lines in addition to the "salt" line, which required boxing other products including iodine, Germ-X, and alcohol. (*Id.*) None of these products was as heavy as the salt bags.(*Id.*)

Shortly after Neal began working at Vi-Jon, the plaintiff's third-shift Team Lead, Theresa Brown-Carver, saw her sitting down during a period when her line was shut down and subsequently overheard her telling a co-worker that she was pregnant. (Neal Dep. 45–46.) Brown-

---

[2] The plaintiff stated that the salt line was the "heaviest line" she dealt with, and the salt bags were "eight pounds each" and she put "at most six bag[s] in a box." (Neal Dep. 38.) She then clarified that they also dealt with smaller bags of four pounds each, and she believed that the eight-pound bags were "three in a box." (*Id.*; *see also* Doc. No. 38-5, McClanahan Dep. 12–13 (confirming that a packed box of eight-pound salt bags weighed twenty-four pounds).)

[3] The complete deposition transcripts filed by the plaintiff are in condensed form, with four pages per standard page. The court cites them by referring to the original deposition transcript pagination.

Carver "told [Neal] to get a doctor's note . . . [b]ecause [she was] pregnant . . . so she could accommodate [her] and not write [her] up . . . for sitting down" mid-shift. (*Id.* at 46.) On March 1, 2024, the plaintiff provided a letter from her doctor requesting accommodations for her pregnancy, including, as relevant here: "[n]o lifting, pushing or pulling anything that is 20lbs or heavier . . . . Please allow for frequent seated breaks through each shift." (Doc. No. 34-2 at 26, Neal Dep. Ex. 2.)[4] She apparently gave the letter to Brown-Carver, who told manufacturing manager Camron McClanahan about the letter. McClanahan testified that he heard about Neal's presenting a doctor's letter through Theresa Brown-Carver, and he instructed Brown-Carver to take the restrictions to Human Resources ("HR"). (Doc. No. 38-5, McClanahan Dep. 10.)

The same day, Neal met with Vi-Jon's HR team members, Alonzo Hudgins and Jamil Moore, to discuss her request for accommodations. (RSUMF ¶ 20.) This conversation was video-recorded by the plaintiff, and the recording was played during her deposition and transcribed as part of Neal's deposition transcript.[5] During this meeting, Hudgins and Moore[6] explained to Neal that she was not eligible for FMLA leave, because she had not worked for Vi-Jon for long enough. (Neal Dep. 59.) They confirmed that she had a twenty-pound lifting restriction, and Neal responded that a "single salt bag does not weigh that much." (*Id.*) They then told her that the lifting restriction was less of an issue than her need for "multiple breaks," because the third shift already ran on a

---

[4] The doctor's note also requested that Neal not be required to work shifts longer than eight hours or more than forty hours per week. (Doc. No. 34-2 at 26.) These restrictions do not appear to have posed a problem, as the parties do not discuss them.

[5] The court has reviewed the thumb-drive of the recording submitted by the defendant but has relied on the deposition transcript, as the audio is difficult to hear and understand.

[6] The deposition transcript does not distinguish between the speakers, other than Neal, and neither Hudgins nor Moore stated his name during the meeting. The court therefore refers to what Hudgins and Moore collectively said during this meeting, rather than attributing particular statements to either individual.

"skeleton crew." (*Id.* at 59–60.) Neal responded that salt was not "constantly coming down the line" and that, in addition to the two company-required breaks, there were plenty of times that there was "nothing coming down the line" and that she could take those opportunities to sit down, as long as she was "not written up for just sitting down." (*Id.* at 60.) Hudgins and Moore acknowledged that there are "times where production runs slow," but they claimed that these instances were not predictable and so, while there were opportunities for breaks, they were "small" and not something they could "accommodate . . . on a regular basis. So the accommodation has to be something [we] cannot break." (*Id.* at 61.) Hudgins and Moore thus made it clear that the company would not accommodate Neal's need for "frequent" breaks. When Neal asked if this meant that she was being fired, they assured her that they were not terminating her and that, although she was not eligible for FMLA leave, she would be eligible for ninety days of unpaid leave under Vi-Jon's Company Leave policy. (*Id.* at 61–62.)

Neal insisted that she did not want to take leave. (*Id.* at 62–63.) Hudgins and Moore stated that that was "all we have available." (*Id.* at 63.) Neal responded that she did not want to "mess up production," and she would be fine with taking breaks only when "the production is slow, because . . . there's a lot of times the machine is screwed up. Let's be honest. It's all of the time, you know . . . ." (*Id.*) Hudgins and Moore stated that they needed an accommodation that "fits," not just one that "fits sometimes." (*Id.* at 63–64.) They insisted that she "ha[d] to take those breaks" and that, if she came off the line when it was not down, it would "mess up the line." (*Id.* at 65.) Neal pointed out that her doctor's letter noted that she needed "frequent" breaks without specifying how often, and she asked why she could not be the one to determine how frequently she needed to take a break. (*Id.*) Hudgins and Moore responded that she was not a medical professional, and one of them (apparently Hudgins) told her that there was a "classification for what frequent means. . . .

We know that . . . frequent is three to five times; there is a number associated with it." (*Id.* at 63–64.) The plaintiff appeared to accept this number. (*See id.* at 64 ("Okay.").) In his deposition, Hudgins clarified that he got this information from doctors' letters in "worker comp cases where limited work is being requested." (Hudgins Dep. 58–59.)

Neal disclosed that hers was considered a high-risk pregnancy, which prompted Hudgins and Moore to emphasize that, because she was high risk, they did not "want to take any chance of violating [her] restrictions." (*Id.* at 68.) The plaintiff downplayed these concerns, stating that she was "really comfortable" on third shift, but for her need to be able to sit down without being written up, and that the shift was "perfect" for her child-care schedule. (*Id.* at 69.)

Asked how good she was on a computer, Neal responded that she had a laptop at home but "as far as like?"—indicating that she was not good on a computer. (*Id.* at 69–70.) Hudgins and Moore told her to "come back to [the facility] on Monday" and that they would continue to consider the options. (*Id.* at 70.) Hudgins and Moore noted that they wanted to avoid "unforeseen" problems that might be caused by "improper strain, turning, doing something the wrong way," at which point Neal interrupted to say that she was a "very strong person" and could lift up to twenty pounds. (*Id.* at 72.) Hudgins and Moore expressed concern about "liability and personal health," one of them adding, "And the last thing I ever want to report out is that this facility had an employee lose their child from work." (*Id.*)

The meeting concluded at that point, with Neal saying she would come back on Monday, and one of the others stating, "[t]hird shift, right?" She responded, "Uh-huh," and they confirmed, "Okay. Come back and see us on Monday. We'll try." (*id.* at 73.)

As indicated above, manufacturing manager McClanahan heard through Brown-Carver that Neal had submitted a doctor's letter, but he found out what the restrictions were only through

HR. (McClanahan Dep. 10–11.) Moore testified that he would not have shown the letter to McClanahan and instead would have told him that Neal had "restrictions" and discussed "potential accommodations" with him. (Moore Dep. 20–21.) During that conversation, which apparently took place before Hudgins and Moore met with Neal, McClanahan told Moore that there were "not any accommodations that could be made in that area at that shift at that time." (*Id.* at 21; *see id.* at 24; *accord* McClanahan Dep. 12 (noting that he talked with "HR" about trying to accommodate the restrictions, as they were described to him, and he determined that they could not accommodate Neal's need for "frequent seated breaks, leaving the line").) Regarding these breaks, McClanahan also testified that he was told by HR that Neal would need "up to four [breaks] per hour." (*Id.* at 29.) He reiterated his understanding that that meant she would need up to "30-plus breaks during her shift" and that the company "could not accommodate that." (*Id.* at 30.) He also believed that, to take a break, Neal would have to "leav[e] the line, go[] into the break room, sit[] down for whatever period of time it was." (*Id.* at 23.) Ordinarily, he said, workers got one fifteen-minute break approximately two hours into their shift, and then a thirty-minute lunch break. (*Id.*)

When the plaintiff returned to the facility on Monday, she was told by HR that there was a "possibility of a cleaning crew position coming up," though the schedule would be "completely different" and, in any event, because the position was not immediately available, they put her on ninety-days leave that day. (Neal Dep. 78.) Neal understood that the company would contact her if a cleaning crew position became available. Although the position was a weekend shift, it would also have fit well with her child-care-related schedule. (*Id.*) The company never called her, but the record shows that a housekeeping position became open and was offered (as a transfer position) to Sherry Agnor, beginning on April 18, 2024, or approximately five weeks after Neal was placed on unpaid leave. (*See* Doc. No. 38-11.)

In addition, although the plaintiff testified that she ran into McClanahan on the Monday she was told she would be on leave, and McClanahan told her that he did not believe the lifting restriction would be a problem (Neal Dep. 44), McClanahan testified that he believed that the plaintiff's position could not accommodate her twenty-pound restriction of lifting, pushing, or pulling (McClanahan Dep. 14–15). He indicated that the plaintiff's position required "pushing" more than twenty pounds, because the full boxes of salt bags weighed twenty-four pounds. (*Id.* at 14.) Even though the boxes were on a motorized conveyor, sometimes the box "stop[ped] between the case sealer and conveyor," at which point the worker "may have to exert force to push it through." (*Id.* at 15.)

In any event, after being on unpaid leave for ninety days, the plaintiff was terminated, based on there being no third-shift positions available that could accommodate her requested work restrictions. (Hudgins Dep. 83, 88.) According to Hudgins, instead of terminating the plaintiff immediately when her leave expired on June 6, 2024, Hudgins called Neal to ask if she would be open to working a shift other than the third shift, and she told him that only third shift worked for her schedule. (Doc. No. 34-1, Hudgins Decl. ¶¶ 20–21.) Neal did not recall this telephone call, but she is "certain that no one from Vi-Jon ever made a definite offer for [her] to work in a different position or on a different shift during [her] pregnancy." (Doc. No. 38-10, Neal Decl. ¶ 4.) More specifically, aside from confidential discussions that may have occurred during the EEOC mediation, Neal is "certain that no one from Vi-Jon ever offered for [her] to work on first shift during [her] pregnancy." (*Id.*) Although she preferred third shift because it made it easier for her and her grandmother to deal with "childcare issues," she "could have made first shift work if it had been offered to [her]" and "would have accepted working on first shift during [her] pregnancy so that [she] could keep working and have an income." (*Id.* ¶ 8.)

Without identifying any specific employees, Hudgins testified that, if an employee had to be off work for six months or nine months due to a worker's compensation injury, the company would keep that employee's job open and "allow them to be out and to return to their job if they had a workers' comp injury that kept them out for nine months." (Hudgins Dep. 60.)

## IV. DISCUSSION

### A. PWFA and TPWFA and Failure-to-Accommodate Claims

#### 1. *Legal Standards*

The TPWFA, enacted in June 2020, requires covered employers to engage in the interactive process and to make reasonable accommodations for employees who have "medical needs arising from pregnancy, childbirth, or related medical conditions . . . , unless the employer demonstrates that the accommodation would impose an undue hardship on the operation of the business of the employer." Tenn. Code Ann. § 50-10-103(b)(1). Similarly, the federal PWFA, which was enacted on December 29, 2022 and took effect on June 27, 2023, requires covered employers[7] to "make reasonable accommodations to the known limitations related to the pregnancy, childbirth, or related medical conditions of a qualified employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 2000gg-1(1). A "known limitation" includes a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." *Id.* § 2000gg(4).

To be a "qualified employee" under the PWFA, the employee must be able to "perform the essential functions" of her position, "with or without a reasonable accommodation"—but will

---

[7] Under both statutes, a covered employer is one that employs fifteen or more employees. Tenn. Code Ann. § 50-10-102(2); 42 U.S.C. § 2000gg(2)(B)(i). There is no dispute in this case that Vi-Jon qualifies as a covered employer.

nonetheless still be deemed "qualified" if her inability to perform an essential function is "temporary," "could be performed in the near future," and "can be reasonably accommodated." 42 U.S.C. § 2000gg(6); 29 C.F.R. § 1636.3(f)(2). Thus, the "[t]emporary suspension of essential function(s) and/or modifications or adjustments that permit the temporary suspension of essential function(s)" are defined in the implementing regulations as reasonable accommodations. *See* 29 C.F.R. § 1636.3(h)(1)(iv). The TPWFA does not incorporate reference to the ADA's "essential functions" concept at all. *See* Tenn. Code Ann. §§ 50-10-102, -103.

While "the terms 'reasonable accommodation' and 'undue hardship'" as used in the PWFA "have the meanings given such terms" in the ADA, 42 U.S.C. § 2000gg(7), the PWFA and TWPFA expressly require accommodations for "known limitations for medical needs" relating to an employee's pregnancy. Tenn. Code Ann. § 50-10-103(b)(1); *see also* 42 U.S.C. § 2000gg-1(1). Examples of reasonable accommodations include such things as "reassignment to a vacant position," "breaks for . . . resting," and "providing seating for jobs that require standing." C.F.R. § 1636.3(*i*)(2);[8] *see also* Tenn. Code Ann. § 50-10-102(3)(B), (D) (identifying reasonable accommodations as potentially including "[p]roviding more frequent, longer, or flexible breaks" and "allowing the employee to sit more frequently if the job requires standing"). Providing unpaid leave may be a reasonable accommodation. 29 C.F.R. § 1636.3(*i*)(3)(i). However, under both federal and state law, it is unlawful to "[r]equire an employee to take leave under a leave law or

---

[8] Although the statute took effect in the summer of 2023, the EEOC did not issue regulations to carry out the PWFA until April 15, 2024, six weeks after Neal first requested accommodations. The regulations went into effect on June 18, 2024, *see* https://www.federalregister.gov/documents/2024/04/19/2024-07527/implementation-of-the-pregnant-workers-fairness-act, just after Neal was terminated. Obviously, Vi-Jon did not have the benefit of the regulations when it was dealing with the plaintiff's accommodation request, but it does not argue that the timing of the implementation of the regulations has any bearing on its obligation to accommodate the plaintiff's pregnancy-related restrictions.

policy adopted by the employer if another reasonable accommodation can be provided." Tenn. Code Ann. § 50-10-103(b)(2); *see also* 42 U.S.C. § 2000gg-1(4).

The PWFA's regulations state that, "[t]o determine the appropriate reasonable accommodation, it may be necessary for the covered entity to initiate an informal, interactive process" for the purpose of "identify[ing] the known limitation[s] under the PWFA and the adjustment or change at work that is needed due to the limitation[s], if either of these is not clear from the request, and potential reasonable accommodations." 29 C.F.R. § 1636.3(h)(3) & (k)). Similarly, the TPWFA appears to require the employer to "engag[e] in a good faith interactive process with the employee to determine if a reasonable accommodation can be provided absent undue hardship." Tenn. Code Ann. § 50-10-103(c).

### 2. *Application to the Plaintiff's Claims*

Vi-Jon asserts that it is entitled to summary judgment on the plaintiff's failure-to-accommodate claims because it offered a reasonable accommodation—unpaid leave—and then terminated the plaintiff because she was unable to return to work, due to her restrictions, after the ninety days of leave under the company leave policy expired. The court finds that material factual disputes preclude summary judgment.

As the defendant describes the course of events, it engaged in the interactive process when Hudgins and Moore met with Neal to "discuss possible ways to accommodate Plaintiff's pregnancy restrictions." (Doc. No. 33 at 13.) According to Vi-Jon, during this discussion, Hudgins and Moore "made several suggestions of other roles and/or shifts to accommodate Plaintiff's pregnancy," and Moore "recommended a schedule change and explained that Vi-Jon . . . ran a skeleton crew on third shift, so third shift would not work with Plaintiff's requested restrictions." (*Id.* at 14.) Vi-Jon states that *Neal* requested company leave as an accommodation, because "there were no available positions on third shift" that could accommodate her restrictions, she was not

good on computers, and she was not willing to alter her schedule. (*Id.*) Vi-Jon claims that Neal requested and received ninety days unpaid leave, at the end of which Hudgins asked her if she would be willing to work some shift other than third shift. Hudgins testified that the plaintiff responded that only the third shift would work for her, and, because there were no third shift positions available that would accommodate her restrictions, she was terminated. (*Id.* at 15.)

Neal's version of events is starkly different. First, Neal's position is that the interactive process was "sabotaged" by Moore's telling McClanahan that Neal would need four breaks *per hour*, on the basis of which McClanahan concluded, even before Hudgins and Moore met with Neal, that the company could not accommodate her need for "frequent" breaks. In other words, McClanahan communicated to Neal and Moore, before the meeting, that the company could not accommodate Neal's need for "frequent" breaks, but his decision was based on Moore's telling him that she would need up to four breaks per hour. Nothing in the record suggests that Neal needed four breaks per hour, and it seems clear that, by the time Hudgins and Moore met with Neal, they had already decided that the company could not accommodate her requested restrictions in a way that would allow her to continue working her third-shift position.

In addition, Hudgins and Neal seemed to agree that "frequent" breaks meant three to five breaks per shift, or one to three extra breaks per shift (in addition to the two already provided), and the plaintiff has presented evidence that the lines frequently stopped for at least several minutes one to three times during every shift, for various reasons, providing built-in opportunities for breaks.[9] Moreover, it does not appear from the record that Hudgins or Moore discussed with

---

[9] During her meeting with Hudgins and Moore, the plaintiff testified that the line always stopped a few times each night. (*See* Neal Dep. 60, 63.) With her Response to the Motion for Summary Judgment, she submitted exhibits to which she refers as Vi-Jon's "Shift Reports" and "Summary of Shift Reports" (Doc. Nos. 38-7, -8, -9), but no narrative explanation of what these documents are or how to construe them.

McClanahan or the plaintiff's shift supervisor whether it would be unduly burdensome for Neal to take an extra one to three seated breaks *per shift*, or whether it was reasonable to allow her to sit down near the line, rather than retreating to the break room, as McClanahan assumed would be necessary. In other words, there is a question of fact as to whether Vi-Jon engaged in good faith in the interactive process and as to whether it could have accommodated the plaintiff's "frequent breaks" restriction. At a minimum, if there was some ambiguity as to what "frequent" meant, Vi-Jon should have requested clarification from the plaintiff's provider. *Accord* 29 CFR § 1636.3(l)(2).

Similarly, regarding the lifting/pushing restriction, according to the plaintiff's version of what her job entailed, she was never required to lift more than eight pounds. Hudgins apparently agreed that if she worked the "middle of the line," she never had to lift boxes because the conveyor belt carried them down the line. (*See* Hudgins Dep. 55–56.) Insofar as McClanahan claimed in his deposition that pushing the box down the motorized conveyor involved pushing up to twenty-four pounds, the company performed no analysis to determine whether pushing a twenty-four pound box down a motorized conveyor equated to pushing more than twenty pounds. Insofar as McClanahan claimed that "sometimes the box will stop in between the case sealer and conveyor," requiring the worker to "exert force to push it through" (McClanahan Dep. 14), there is no indication in the record as to how frequently this occurred or how much force was required when it did. Regardless, the plaintiff testified that McClanahan told her that he "saw no reason" why the lifting restriction would be a problem. (Neal Dep. 55.) In other words, there is a genuine issue of material fact as to whether Vi-Jon could have accommodated the plaintiff's lifting/pushing restriction as well, and thus a material factual dispute as to whether Vi-Jon could have

accommodated the plaintiff's requested accommodations in a way that would have permitted her to continue working her same job and same shift.

Even if that were not the case, there are also disputed facts regarding whether the plaintiff would have been willing to transfer, at least temporarily, to first shift and as to whether she could have been offered the housekeeping job that came open six weeks after she was placed on unpaid leave. Vi-Jon insists that the court should disregard the plaintiff's Declaration testimony in which she avers that she is "certain" no one at Vi-Jon offered her a position on a different shift and that she would have accepted a first-shift position if one had been offered to her. (Neal Decl. ¶¶ 4, 8.) According to Vi-Jon, the plaintiff made it clear that she would only work third shift. (*See* Doc. No. 40 at 2.) The court, however, has reviewed the videorecording and read the transcript of the meeting between Neal, Hudgins, and Moore. While the plaintiff did confirm that third shift was "perfect" for her, the recording of their conversation does not establish that she, Hudgins, and Moore ever discussed, directly or indirectly, whether Neal might be willing to transfer to a different shift. Moore (or Hudgins) indeed noted that the third shift was chronically understaffed, but they did not then suggest that the plaintiff's restrictions could be accommodated if she agreed to change to first or second shift. Accordingly, the plaintiff's Declaration testimony does not contradict her earlier sworn testimony and may be considered by the court. And it creates a material factual dispute as to whether the plaintiff was ever offered a position on a different shift and as to whether she would have accepted one if it had been offered.[10]

---

[10] The court observes that the plaintiff's insistence that "Hudgins knew that Plaintiff was willing to work other shifts," in support of which she cites only Moore's testimony, does rely on evidence that "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Moore testified only that he "believed" that he heard from Hudgins that Neal was willing to switch shifts, but he was not a party to that conversation. (Moore Dep. 45–46, 48.) This is clearly hearsay that cannot be presented in a form that would be admissible in evidence.

There is also a material factual dispute as to whether the plaintiff could have been offered the housekeeping position that came open a few weeks after she was placed on leave. The defendant contends that this position "did not work for Plaintiff because it was not on third shift." (Doc. No. 33 at 5.) The plaintiff testified that she understood that it was not third shift but that it would have been "perfect" for her childcare schedule, and she went on leave with the understanding that Vi-Jon would call her if a weekend cleaning crew position became available. (Neal Dep. 78.) But no one called her to offer her the position. (*Id.* at 79.) Her cousin Sherry took the position instead. (*Id.* at 80; *see also* Doc. No. 38-10.)

Finally, the plaintiff testified that she did not request to go on leave and certainly did not request leave of only ninety days. She took leave because it was better than being fired. (Neal Decl. ¶¶ 5, 7.) And the defendant does not adequately address why allowing the plaintiff to stay on unpaid leave through the end of her pregnancy, instead of terminating her after ninety days, would not have been a reasonable accommodation (particularly given that, as Moore testified, shift three is chronically short-staffed).

In short, material factual disputes preclude summary judgment on the plaintiff's failure-to-accommodate claims under the PWFA and TPWFA.

### B.    Remaining Claims

While the standards that apply to the plaintiff's discrimination and failure-to-accommodate claims under Title VII, as amended by the PDA, differ somewhat from the standards that apply to the plaintiff's failure-to-accommodate claims under the PWFA and TPWFA, the legal claims and the facts supporting them—and the relief available, should the plaintiff prove them—overlap sufficiently that it would be a waste of judicial time and resources for the court to address them separately. That is, even if the court granted summary judgment to Vi-Jon on these claims, it would not appreciably shorten the trial or affect the parties' trial preparation. Given that the court has

already determined that the plaintiff's PWFA and TPWFA claims must be resolved by a jury, the court declines to consider whether Vi-Jon is entitled to summary judgment on the plaintiff's related Title VII claims.

## V. CONCLUSION

The defendant's Motion for Summary Judgment (Doc. No. 32) will be denied. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge